# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
Filed: July 27, 2022

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * * * * * * | | |
| DAWNA MICHELLE COX, | * | No. 18-1531V |
| *Administratrix for the estate of* | * | |
| DAVID CARROLL COX, | * | |
| | * | Special Master Sanders |
| Petitioner, | * | |
| v. | * | |
| | * | |
| SECRETARY OF HEALTH | * | Attorneys' Fees and Costs |
| AND HUMAN SERVICES, | * | |
| | * | |
| Respondent. | * | |
| | * | |
| * * * * * * * * * * * * * * * * * * * * * * * * | | |

*Cole T. Tomlinson*, The Law Offices of Cole T. Tomlinson, Shelbyville, KY, for Petitioner.
*Colleen C. Hartley*, U.S. Department of Justice, Washington, DC, for Respondent.

### DECISION AWARDING ATTORNEYS' FEES AND COSTS[1]

On October 3, 2018, Dawna Cox ("Petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program[2] ("Vaccine Program" or "Program"). 42 U.S.C. § 300aa-10 to 34 (2012). Petitioner alleged that the decedent, David Cox, suffered motor neuron disease, Amyotrophic Lateral Sclerosis ("ALS"), and death due to Hepatitis B vaccinations administered on January 14, 2016, and February 16, 2016. Pet. at 1, ECF No. 1. I ordered Petitioner to file an expert report, and Petitioner indicated that she had retained Dr. Devrah Arndt, an assistant professor of toxicology at the University of Florida, to opine in this case. ECF Nos. 62, 64. Due to difficulties regarding the COVID-19 pandemic affecting Petitioner's counsel and expert, Petitioner filed a motion to stay pending deadlines on April 20, 2020. ECF No. 66. On August 6, 2020, Petitioner filed a status report stating that "Dr. Arndt stated that she could not advise when her report would be completed due to the COVID-19 pandemic and has offered to return the expert

---

[1] This Decision shall be posted on the United States Court of Federal Claims' website, in accordance with the E-Government Act of 2002, 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the Internet**. In accordance with Vaccine Rule 18(b), a party has 14 days to identify and move to delete medical or other information that satisfies the criteria in § 300aa-12(d)(4)(B). Further, consistent with the rule requirement, a motion for redaction must include a proposed redacted Decision. If, upon review, I agree that the identified material fits within the requirements of that provision, such material will be deleted from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub L. No. 99-660, 100 Stat. 3755 ("the Vaccine Act" or "Act"). Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

witness fee previously paid by Petitioner's counsel in the event her expert witness report cannot be tendered as required by the Court." ECF No. 68 at 2. Petitioner stated that her counsel was working to retain co-counsel in this case and a substitute or additional expert witness. *Id.* Between August 2020 and April 2021, Petitioner did not retain co-counsel or file an expert report. *See* ECF Nos. 69–74. On April 19, 2021, Petitioner filed a motion for a decision dismissing her petition. ECF No. 75. I issued a dismissal decision on April 30, 2021. ECF No. 76.

On November 24, 2021, Petitioner filed a motion for final attorneys' fees and costs. ECF No. 80. On December 8, 2021, Petitioner filed a more detailed motion for attorneys' fees and costs. Pet'r's Supp. Mot. for Attorneys' Fees and Costs [hereinafter "Pet'r's Mot. for AFC"], ECF No. 81. Petitioner requests total attorneys' fees in the amount of **$14,496.00.** *Id.* at 6. Petitioner did not request any compensation for attorneys' costs. *See id.* In support of reasonable basis, Petitioner stated that "[t]he link between the Hepatitis B [sic] and neurological disorders has been well documented for decades[] . . . ." *Id.* at 2. She cited, but did not file, medical literature purportedly linking the Hepatitis B virus and motor neuron disease and the Hepatitis B vaccine and neurological conditions such as ALS. *Id.* at 2–3. Discussing her difficulty obtaining an expert report, Petitioner stated that "all subsequent experts consulted in this matter were unwilling to act as an expert witness for an affordable fee and, due to the timing of opening a solo practice immediately prior to the [COVID-19] pandemic, [counsel] was unable to contribute to the Petitioner's expert witness fees." *Id.* at 5. Petitioner stated that her counsel consulted other attorneys to refer this case or substitute counsel but was unsuccessful. *Id.* Pursuant to General Order No. 9, Petitioner has indicated that she has not incurred any personal expenses as a result of this claim. *Id.* at 2; ECF No. 85 Respondent filed his response on December 8, 2021, stating that Respondent "defers to the Special Master to determine whether the statutory requirements for an award of attorneys' fees and costs (including the reasonable basis requirement) are met in this case." Resp't's Resp. at 2, ECF No. 82. Respondent requested "that the Court exercise its discretion and determine a reasonable amount for attorneys' fees and costs, if any." *Id.* at 3. Petitioner did not file a reply thereafter. This matter is now ripe for consideration.

## I. Medical History

Mr. Cox received his Hepatitis B vaccinations on January 14, 2016, and February 16, 2016, after possibly being exposed to blood at work. Pet'r's Ex. 3 at 1, ECF No. 41-3. On May 24, 2016, he and Petitioner presented to a new provider and reported that "[a]bout [one] month ago[, Mr. Cox] woke up not feeling [like] himself." Pet'r's Ex. 5 at 1, ECF No. 41-5. Mr. Cox reported problems with balance, changes in speech, choking when eating, vision problems, muscle twitching in his biceps, muscle cramping in his legs, neck pain, weakness in his hands and arms, and fatigue. *Id.* Petitioner reported that Mr. Cox was also experiencing confusion. *Id.* On exam, Mr. Cox showed signs of cognitive impairment. *Id.* at 3.

On May 26, 2016, Mr. Cox presented to the emergency department at the University of Louisville Hospital and reported a one-month history of weakness and fatigue as well as speech problems for the past one to two weeks. Pet'r's Ex. 7 at 4, ECF No. 42-1. He reported "a transient episode of left facial droop and left arm tingling and numbness" that occurred earlier that day. *Id.* Mr. Cox was assessed with possible ALS and directed to follow up with his primary care provider ("PCP") and a neurologist. *Id.* at 5.

Mr. Cox followed up with neurologist Martin Brown, M.D. on June 22, 2016, after Dr. Brown performed Mr. Cox's lumbar puncture earlier that month. Pet'r's Ex. 9 at 1–4, ECF No. 42-3; Pet'r's Ex. 10 at 61, ECF No. 42-4. Mr. Cox told Dr. Brown that his symptoms began in April, following his Hepatitis B vaccinations.[3] Pet'r's Ex. 9 at 1. Mr. Cox reported progressive generalized weakness as well as difficulty swallowing, dysarthria, voice changes, muscle twitching, and difficulty walking. *Id.* Dr. Brown noted that Mr. Cox had an abnormal EMG on June 2, 2016, that was concerning for motor neuron disease. *Id.* Dr. Brown stated, however that "the diffuse involvement and the sudden onset is not typical for this." *Id.* at 4. Mr. Cox expressed concern that "his condition is due to an immune response to [his Hepatitis B vaccination], something like [Guillain-Barré Syndrome ("GBS")]." Dr. Brown stated, "[w]ith the alternative diagnosis of an untreatable neurodegenerative disease, [they] discussed proceeding with a treatment for an autoimmune disease affecting the nervous system." *Id.* Dr. Brown presented IVIG and plasma exchange ("PLEX") as treatment options, and Mr. Cox elected to proceed with PLEX. *Id.* Dr. Brown referred Mr. Cox to nephrology and listed the diagnosis as "[i]nflammatory autoimmune disorder[.]" *Id.*

After Mr. Cox had PLEX treatments, he presented to his PCP, Kenneth Gravett, D.O., and reported that he had had "[five] plasma exchanges due to reaction to [H]epatitis B injection." Pet'r's Ex. 4 at 5. Dr. Gravett wrote that Mr. Cox "was diagnosed with acute cervical sematic dysfunction and possible [GBS] based on what the patient was saying . . . ." *Id.*

On August 29, 2016, Mr. Cox presented to neurologist Jennifer Tracy, M.D. Pet'r's Ex. 19 at 10, ECF No. 43-9. Dr. Tracy noted that Mr. Cox had undergone five plasma exchanges. *Id.* at 11. Mr. Cox reported that his speech, strength, and mobility improved after the third session. *Id.* Mr. Cox and Petitioner noted that they had documented Mr. Cox's improvement on video. *Id.* However, they reported that Mr. Cox's condition worsened again about a week after filming the video. *Id.* Mr. Cox told Dr. Tracy that he was "concerned that there was something wrong with the [H]epatitis B shots he received. He sa[id] that a colleague of his at work who had also received [the vaccinations after they were possibly exposed to blood at work] had had problems with speech lasting two weeks but no other symptoms." *Id.* Inconsistent with Mr. Cox's vaccination record, Dr. Tracy wrote that Mr. Cox's Hepatitis B vaccination doses were administered on February 14 and March 14. *Id.* Dr. Tracy stated that Mr. Cox's examination was "most consistent with motor neuron disease, and the pattern of his findings would be most suggestive of [ALS]." *Id.* at 11. She continued that "it is unusual that this has progressed so quickly, that it came on in the context of vaccinations, and that he appears to have had some clinical benefit from plasma exchange." *Id.* Dr. Tracy determined that it was "important to look more broadly to see if there is any evidence of any underlying immune-mediated process which may be treatable." *Id.* She recommended further testing. *Id.* After undergoing further testing, Mr. Cox followed up with Dr. Tracy on September 1, 2016. *Id.* at 41. Dr. Tracy's assessment was motor neuron disease, and she stated that Mr. Cox's clinical examination and testing were consistent with ALS. *Id.* She continued that there were some remaining pending tests but that "so far there is nothing to support an immune-mediated process which is ongoing on our current testing." *Id.* She noted, however, that Mr. Cox's "symptoms came on quite abruptly within a few weeks of vaccination, and by the family's report he had a significant improvement in his ability to stand and in his voice with a prior use of plasma exchange. Those

---

[3] The record incorrectly indicates that Mr. Cox received the Hepatitis B vaccine in March.

3

historical details raise the question as to whether there may some be some benefit in a trial of immunotherapy to see if this would improve his status." *Id.* Dr. Tracy recommended IVIG, and she said Mr. Cox could consider Solu-Medrol if he could not obtain IVIG. *Id.* at 41–42.

On September 20, 2016, Petitioner had a phone call with Dr. Tracy and reported that Mr. Cox's insurance did not approve him for IVIG treatments. *Id.* at 45. Dr. Tracy noted that, due to Mr. Cox's motor neuron disease diagnosis, they did "not have real literature to support the use of IVIG in this case." *Id.* Dr. Tracy stated that "[t]he main reason for a planned treatment trial was because of the post-vaccination onset of his symptoms as well as his purported benefit in the past with the use of plasma exchange." *Id.* Dr. Tracy recommended proceeding with Solu-Medrol. *Id.*

Petitioner spoke to Dr. Gravett on September 23, 2016, and reported that Mr. Cox had been diagnosed with GBS. Pet'r's Ex. 4 at 5. Petitioner also noted "concern at that time for possible ALS[.]" *Id.* On September 28, 2016, Mr. Cox returned to Dr. Brown. Pet'r's Ex. 9 at 5. Dr. Brown noted that Mr. Cox presented for "quickly progressive muscle weakness, dysarthria, and dysphagia which seemingly stated after receiving a series of Hepatitis B [v]accine[s]. His symptoms reportedly improved for about two days after PLEX, but quickly regressed." *Id.* at 7. Dr. Brown's assessment included ALS, dysarthria, dysphagia, muscle weakness, and motor neuron disorder. *Id.* Dr. Brown directed Mr. Cox to stop Solu-Medrol because Mr. Cox had not noticed improvement and was experiencing side effects. *Id.* He prescribed riluzole for motor neuron disease and directed that Mr. Cox be admitted to the hospital for testing and repeat PLEX treatment. *Id.*

Mr. Cox was admitted to the hospital on September 28, 2016. Pet'r's Ex. 21 at 4, ECF No. 44-1. After his admission, Mr. Cox received "a full course of PLEX for possible reversible cause of symptoms with no documented improvement." *Id.* Mr. Cox was transferred to the intensive care unit on October 3, 2016. *Id.* at 5. His respiratory status further deteriorated, and he passed away on October 4, 2016. *Id.* The post-mortem examiner's final diagnosis was ALS. Pet'r's Ex. 30 at 23, ECF No. 45-1.

## II. A Final Fees Award is Appropriate

Vaccine Program attorneys are not automatically entitled to a fees award in unsuccessful cases like this one. At a minimum, such a claim must be shown to have: (1) possessed reasonable basis; and (2) have been brought in good faith. *See, e.g.*, *Chuisano v. Sec'y of Health & Hum. Servs.,* 116 Fed. Cl, 276, 284 (2014). Reasonable basis is an objective inquiry while good faith is a subjective inquiry. *Id.* at 289.

Without evidence of bad faith, "petitioners are entitled to a presumption of good faith." *Grice v. Sec'y of Health & Hum. Servs.,* 36 Fed. Cl. 114, 121 (1996). Thus, so long as Petitioner had an honest belief that her claim could succeed, the good faith requirement is satisfied. *See Riley v. Sec'y of Health & Hum. Servs.*, No. 09-276V, 2011 WL 2036976, at *2 (Fed. Cl. Spec. Mstr. Apr. 29, 2011) (citing *Di Roma v. Sec'y of Health & Hum. Servs.,* No. 90-3277V, 1993 WL 496981, at *1 (Fed. Cl. Spec. Mstr. Nov. 18, 1993)); *Turner v. Sec'y of Health & Hum. Servs.*, No. 99-544V, 2007 WL 4410030, at *5 (Fed. Cl. Spec. Mstr. Nov. 30, 2007).

An analysis of reasonable basis requires more than just a petitioner's belief in her claim. *Turner,* 2007 WL 4410030, at *6–7. Instead, the claim must at least be supported by objective

evidence – medical records or medical opinion. *Sharp-Roundtree v. Sec'y of Health & Hum. Servs.*, No. 14-804V, 2015 WL 12600336, at *3 (Fed. Cl. Spec. Mstr. Nov. 3, 2015). A reasonable basis determination is based on a totality of the circumstances inquiry that can be satisfied by reviewing the factual, medical, and jurisdictional support for a claim.[4] *See Cottingham v. Sec'y of Health & Hum. Servs.*, 971 F.3d 1337, 1344–45 (Fed. Cir. 2020); *Chuisano*, 116 Fed. Cl. at 288. The amount of objective evidence that satisfies reasonable basis is more than a scintilla of evidence but less than preponderant evidence. *Cottingham*, 971 F.3d at 1344–45 (clarifying that "the failure to consider objective evidence presented in support of a reasonable basis for a claim would constitute an abuse of discretion."). Thus, petitioners must offer more than an unsupported assertion that a vaccine caused the injury alleged. *See, e.g.*, *Cortez v. Sec'y of Health & Hum. Servs.*, No. 09-176V, 2014 WL 1604002, at *5 (Fed. Cl. Spec. Mstr. Mar. 26, 2014); *McKellar v. Sec'y of Health & Hum. Servs.,* 101 Fed. Cl. 297, 303–04 (2011). Objective medical evidence, including medical records even where the records provide only circumstantial evidence of causation, can support a showing of reasonable basis. *Cottingham,* 971 F.3d at 1346. Further, "absence of an express medical opinion on causation is not necessarily dispositive of whether a claim has reasonable basis." *James-Cornelius v. Sec'y of Health & Hum. Servs.,* 984 F.3d 1374, 1379 (Fed. Cir. 2021) (citing *Cottingham,* 971 F.3d at 1346).

Here, I find Petitioner's claim had a sufficient basis to entitle her counsel to a fee award under applicable reasonable basis and good faith standards. The Federal Circuit has indicated that medical records can support a finding of reasonable basis even when they do not provide direct evidence of causation. In this case, Mr. Cox's medical records repeatedly and consistently demonstrate that Mr. Cox attributed his new and progressive neurologic symptoms to his Hepatitis B vaccinations. Although a petitioner's subjective belief that a vaccine caused his injury is insufficient to establish reasonable basis, Mr. Cox's medical records indicate that his treating physicians considered his Hepatitis B vaccinations as a possible cause of his condition and when prescribing treatment. For instance, although Dr. Tracy ultimately found no evidence of an ongoing immune-mediated process, she noted that the rapid progression of Mr. Cox's condition was unusual. Pet'r's Ex. 19 at 11, 41. Dr. Tracy also noted Mr. Cox's self-reported temporary improvement with PLEX treatment and that his symptoms began post vaccination. *Id.* at 41. With these considerations, Dr. Tracy recommended IVIG treatment, although Mr. Cox was not able to receive it prior to his passing. *See id.* at 41–42, 45. Furthermore, special masters have previously considered the submission of expert reports and medical literature when determining that a claim had reasonable basis. *See, e.g.*, *Otto v. Sec'y of Health & Hum. Servs.*, No. 16-1144V, 2020 WL 4719285, at *4 (Fed. Cl. Spec. Mstr. June 17, 2020). Although Petitioner was ultimately unable to submit an expert report in this case, she was able to find an expert initially willing to opine. Petitioner stated that Dr. Arndt's withdrawal was unrelated to her review of Petitioner's case. Petitioner further attributed her inability to retain another expert to her counsel's financial status. Petitioner also cited medical literature in support of her claim's reasonable basis. Based on the totality of circumstances, I find that there was sufficient evidence in the record to support bringing the claim and seeing it through to its dismissal. Respondent does not otherwise contest reasonable basis or good faith and merely left such a finding up to my discretion. Accordingly, I will award final attorneys' fees.

---

[4] The jurisdictional support for Petitioner's claim is not at issue in this case and therefore will not be addressed.

5

### III.     Reasonable Attorneys' Fees and Costs

The Vaccine Act permits an award of reasonable attorneys' fees and costs. § 15(e). The Federal Circuit has approved the lodestar approach to determine reasonable attorneys' fees and costs under the Vaccine Act. *Avera v. Sec'y of Health & Hum. Servs.*, 515 F.3d 1343, 1348 (Fed. Cir. 2008). This is a two-step process. *Id.* First, a court determines an "initial estimate . . . by 'multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate.'" *Id.* at 1347–48 (quoting *Blum v. Stenson*, 465 U.S. 886, 888 (1984)). Second, the court may make an upward or downward departure from the initial calculation of the fee award based on specific findings. *Avera,* 515 F.3d at 1348.

It is "well within the special master's discretion" to determine the reasonableness of fees. *Saxton v. Sec'y of Health & Hum. Servs.*, 3 F.3d 1517, 1521–22 (Fed. Cir. 1993); *see also Hines v. Sec'y of Health & Hum. Servs.*, 22 Cl. Ct. 750, 753 (1991). ("[T]he reviewing court must grant the special master wide latitude in determining the reasonableness of both attorneys' fees and costs."). Applications for attorneys' fees must include contemporaneous and specific billing records that indicate the work performed and the number of hours spent on said work. *See Savin v. Sec'y of Health & Hum. Servs.*, 85 Fed. Cl. 313, 316–18 (2008). Such applications, however, should not include hours that are "'excessive, redundant, or otherwise unnecessary.'" *Saxton*, 3 F.3d at 1521 (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983)).

Reasonable hourly rates are determined by looking at the "prevailing market rate" in the relevant community. *See Blum*, 465 U.S. at 895. The "prevailing market rate" is akin to the rate "in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Id.* at 895, n.11. Petitioners in the Program bear the burden of providing adequate evidence to prove that the requested hourly rate is reasonable. *Id.*

#### a.  Hourly Rate

The decision in *McCulloch* provides a framework for consideration of appropriate ranges for attorneys' fees based upon the experience of the practicing attorney. *McCulloch v. Sec'y of Health & Hum. Servs.*, No. 09-293V, 2015 WL 5634323, at *19 (Fed. Cl. Spec. Mstr. Sept. 1, 2015), *motion for recons. denied*, 2015 WL 6181910 (Fed. Cl. Spec. Mstr. Sept. 21, 2015). The court has since updated the *McCulloch* rates, and the Attorneys' Forum Hourly Rate Fee Schedules for 2015–2016, 2017, 2018, 2019, 2020, 2021, and 2022 can be accessed online.[5]

Petitioner requests the following hourly rates for the work of her counsel, Mr. Cole Tomlinson: $250.00 per hour for work performed in 2017; $270.00 per hour for work performed in 2018; $300.00 per hour for work performed in 2019 and 2020; and $325.00 per hour for work performed in 2021. Pet'r's Ex. A at 6. Petitioner requested $150.00 per hour for time Mr. Tomlinson expended on paralegal tasks between 2017 and 2021.[6] *Id.* Mr. Tomlinson does not have an established rate in the Program. In his affidavit, Mr. Tomlinson stated that he received his Juris

---

[5] The OSM Fee Schedules are available at: http://www.cofc.uscourts.gov/node/2914. The hourly rates contained within the schedules are updated from the decision in *McCulloch*. *See* 2015 WL 5634323.

[6] Although Petitioner requested this rate for work performed between 2017 and 2021, Petitioner's Exhibit A indicates that Mr. Tomlinson only billed for paralegal tasks inn 2017 and 2018. *See* Pet'r's Ex. A at 6.

Doctorate degree in 2012 and had, as of December 2021, "approximately ten [] years litigation experience in a wide variety of civil practice areas . . . ." ECF No. 83-1 at 2. He indicated that he based his rates on the OSM Fee Schedules and stated that the forum hourly rates "are comparable to the market hourly rates in the greater Louisville, Kentucky area." *Id.*

Mr. Tomlinson's office is located in Shelbyville, Shelby County, Kentucky. The U.S. Bureau of Labor Statistics identifies this city of about 16,000 people approximately thirty miles outside of Louisville as being a part of the Louisville metropolitan area.[7] Furthermore, special masters have previously determined attorneys based in smaller cities located thirty to forty miles outside of cities where forum rates apply could receive forum rates when the U.S. Bureau of Labor Statistics considered the smaller cities to be a part of the larger city's metropolitan area. *Moore v. Sec'y of Health & Hum. Servs.*, No. 15-90V, 2019 WL 423066, at *5 (Fed. Cl. Spec. Mstr. Jan. 10, 2019) (determining that forum rates applied in a city approximately forty miles outside of Miami, Florida); *Razka v. Sec'y of Health & Hum. Servs.*, No. 14-1224V, 2017 WL 3165479, at *2 (Fed. Cl. Spec. Mstr. June 30, 2017) (finding forum rates appropriate for an attorney based approximately thirty-two miles outside of Chicago, Illinois). Few attorneys from Kentucky have practiced in the Vaccine program. *See George v. Sec'y of Health & Hum. Servs.*, No. 17-1489V, 2019 WL 232877, at *2 (Fed. Cl. Spec. Mstr. May 6, 2019). However, a special master has previously determined that forum rates were appropriate for attorneys based in Louisville, Kentucky. *See Wheatley v. Sec'y of Health & Hum. Servs.*, No. 17-0697V, 2019 WL 4911065, at *2–3 (Fed. Cl. Spec. Mstr. May 17, 2019) (adjusting rates due to experience but finding forum rates appropriate for Louisville-based attorneys). Furthermore, special masters have applied forum rates in locations comparable to Louisville in size and/or factors such as cost of living. *See, e.g.*, *Pancoast v. Sec'y of Health & Hum. Servs.*, No. 15-718V, 2016 WL 7574815, at *2–3 (Fed. Cl. Spec. Mstr. Nov. 16, 2016) (finding forum rates appropriate for attorneys based in Memphis, Tennessee, which is similar to Louisville in population and has a slightly lower cost of living.)[8] I therefore find that Mr. Tomlinson is eligible for the same rates as a comparable attorney based in Louisville, Kentucky, and forum rates are appropriate.

Mr. Tomlinson's requested rates for his attorney work are consistent with the OSM Fee Schedules and are commensurate with his experience. I therefore find them appropriate. However, Mr. Tomlinson's requested rate for the paralegal tasks he performed requires slight adjustment. Mr. Tomlinson's billing records indicate that he performed the majority of his paralegal tasks in 2017. *See* Pet'r's Ex. A at 6. However, the paralegal rate Mr. Tomlinson requested is higher than the forum range for 2017, which is $128.00–$148.00. Mr. Tomlinson performed the remainder of his paralegal tasks in 2018, and his requested rate is near the top of the forum range ($132.00–$153.00) for that year. Thus, I will adjust Mr. Tomlinson's paralegal rate to $140.00 per hour for 2017 and $145.00 per hour for 2018.

---

[7] U.S. Bureau of Labor Statistics, Occupational Employment and Wage Statistics, May 2021 Metropolitan and Nonmetropolitan Area Definitions, https://www.bls.gov/oes/current/msa_def.htm#31140 (last visited July 6, 2022).

[8] Best Places, 2022 Cost of Living Calculator, Louisville-Jefferson County, Kentucky vs Memphis, Tennessee, https://www.bestplaces.net/cost-of-living/louisville-ky/memphis-tn/50000 (last visited July 6, 2022).

### b. Reasonable Number of Hours

Attorneys' fees are awarded for the "number of hours reasonably expended on the litigation." *Avera,* 515 F.3d at 1348. Billing for administrative tasks is not appropriate. *See Rochester v. United States*, 18 Cl. Ct. 379, 387 (1989) (stating that services that are "primarily of a secretarial or clerical nature . . . should be considered as normal overhead office costs included within the attorneys' fee rates"); *see also Isom v. Sec'y of Health & Hum. Servs.,* No. 94-770, 2001 WL 101459, at *2 (Fed. Cl. Spec. Mstr. Jan. 17, 2001) (agreeing with Respondent that tasks such as filing and photocopying are subsumed under overhead expenses); *Walters v. Sec'y of Health & Hum. Servs.,* No. 15-1380V, 2022 WL 1077311, at *5 (Fed. Cl. Spec. Mstr. Feb. 23, 2022) (failing to award fees for the review of CM/ECF notifications and the organization of the file); *McCulloch,* 2015 WL 5634323, at *26 (noting that clerical and secretarial tasks should not be billed at all, regardless of who performs them).

Upon review, I find the overall hours billed to be mostly reasonable. However, counsel has not provided sufficiently detailed descriptions for some of the tasks performed to allow me to assess their reasonableness. Mr. Tomlinson billed for correspondence with individuals who appear to be experienced Vaccine Program practitioners in 2017 and 2020. *See* Pet'r's Ex. A at 1–2, 5. Mr. Tomlinson billed for more than two hours of such communications in 2017. *See id.* at 1–2. Although it is apparent why Mr. Tomlinson would be communicating with other attorneys about this case in 2020, when he was attempting to find co-counsel, it is unclear why he would be doing so when he undertook this case in 2017. It is further unclear what these communications contributed to Petitioner's case. Mr. Tomlinson also billed for communications with some individuals whose significance to this case is unclear from the billing records. *See generally* Pet'r's Ex. A. Furthermore, Mr. Tomlinson occasionally billed for administrative tasks such as filing documents. *Id.* I find these issues, including the slightly adjusted paralegal rate, result in a total reasonable reduction of $800.00 Accordingly, Petitioner is entitled to final attorneys' fees in the amount of **$13,696.00**.

### IV. Conclusion

In accordance with the Vaccine Act, 42 U.S.C. §15(e) (2012), I have reviewed the billing records and costs in this case and find that Petitioner's request for final fees and costs is reasonable. Based on the above analysis, I find that it is reasonable to compensate Petitioner and her counsel as follows:

| | |
|---|---|
| Final Attorneys' Fees Requested | $14,496.00 |
| (Reduction to Fees) | -$800.00 |
| **Final Attorneys' Fees Awarded** | **$13,696.00** |
| | |
| Final Attorneys' Costs Requested | - |
| (Reduction of Costs) | - |
| **Final Attorneys' Costs Awarded** | - |
| | |
| **Final Attorneys' Fees and Costs** | **$13,696.00** |

Accordingly, I award a lump sum in the amount of **$13,696.00** to be issued in the form of a check payable jointly to Petitioner and Petitioner's counsel, Cole Tomlinson, for final attorneys' fees and costs.

In the absence of a motion for review filed pursuant to RCFC Appendix B, the clerk of the court **SHALL ENTER JUDGMENT** in accordance with the terms of the above Decision.[9]

**IT IS SO ORDERED.**

s/Herbrina D. Sanders
Herbrina D. Sanders
Special Master

---

[9] Pursuant to Vaccine Rule 11(a), entry of judgment is expedited by the parties' joint filing of a notice renouncing the right to seek review.